No. _____

WESTERN FEDERAL DISTRICT COURT OF NORTH CAROLINA,

CHARLOTTE DIVISION

FILED
CHARLOTTE, NC

MAR 2 9 2022

US DISTRICT COURT
WESTERN DISTRICT OF NC

In re DJM

PETITION FOR REVIEW OF WHOLE RECORD,   1:22 - mc - 13 - MR

AND FOR COMPETENT ATTORNEY

TO FACILITATE PROCEDURE

PETITION TO SEAL

ATTACHMENT 'D',

ORIGINAL FILING OF 22CVS 23, GRAHAM CO., N.C.

This filing contains quite a bit of Confidential information, though none of it is

current, by design. It may still violate Federal HIPAA law, though the Graham Co.

N.C. Clerk of Court refused to seal it.

STATEMENT OF CASE

Ron and Claudia Metcalf, parent/ advocates, legal guardians (though not over his "estate"), and Abound Health NC (headquarters: Charlotte) Relative as Provider (RAP) state employees, do hereby "appeal" (as no other remedies are available in the N.C. state court system; see Attachments) this District 30 NC case, along with all other state and federal filings, still timely as the two-year statute of limitation have never been exhausted, for *de novo* review of the entire legal record; as no Hearing for this has ever been held in the ten year history of state and federal exhaustion procedure, and the same "issue" keeps reappearing; though this, the third "go around", is the first time that this SPECIFIC CLAIM has been addressed; though present since the beginning of the state and federal filing judgments and opinions, appeals, petitions, and complaints.

In March 2012, our disabled and mentally challenged adult son was alleged to be a "THREAT TO SOCIETY" by Swain County N.C. Dept. of Social Svcs., in the initial 12CVD78 District 30A (Swain Co., NC) Hearing where his sister had her infant daughter snatched away by Swain Co. Sheriff deputies on his thirtieth birthday, enforcing her State Actor mother-in-law's orders, who then proceeded to hide the baby under the enforcement of Cherokee Tribal authority under a false Indian Child Welfare Act claim, hiring the Swain County Attorney in her personal behalf.

By March 2014, after hiring two ineffective counsel attorneys ("I CANNOT insult the District 30 Judges and Lawyers) the Meridian Behavioral Health ACTT

supervisor and her legal counsel challenged our right as parents over DJM's legal guardianship, wanting to place him in Broughton State [Mental] Hospital in Morganton, NC. He was appointed a legal guardian ad litem for the official Swain Co. Clerk of Court Hearing, and we successfully gained legal guardianship over our son, but rendering him Incompetent in doing so. That official designation has gone unchallenged in now eight years, though he gained the I/DD (Intellectual, Developmental Disability) official designation in the summer of 2014, shortly after we moved to Graham Co. N.C.; he officially received the NC Innovations Waiver designation on Nov. 1, 2016.

That same month, March 2014, I filed our first N.C. state Appeal, and the first Complaint to Western Federal District Court in Asheville N.C.; to which Judge Reidinger correctly invoked Rooker-Feldman Doctrine (exhaustion of all state and federal remedies before the Complaint can be Heard). This continued until late spring 2015, when SCOTUS Assistant Clerk Redmond Barnes illegally, and I allege deliberately, changed the Filing Date of the complete Petition for a Writ of Certiorari to the U.S. Supreme Court, to make it "out of time" (I still have the original "whited-out" documents).

A second "go around" was begun in late fall of 2015, appealing for a Complete Hearing on the Merits to the District 30 NC Superior Court (Graham Co, NC); that was delayed by the Resident Superior Court Judge (there was also some "conflict of interest"; he should never have heard the case himself) for nearly a year. He ruled that "the District [NC] Courts have SOLE JURISDICTION OVER ALL [my

emphasis] Juvenile Court cases." In preparing the verbal and written Record on Appeal Hearing, I invoked the Child Habeas Corpus NC statutes, which would have "allowed him" (jurisdictionally) to Hear the case, but he refused to acknowledge that I had even officially asked for it (in both the Transcript and ROA). The NC Appellate and Supreme Courts "Affirmed" his Opinion; again, as the Swain County Attorney was once again arguing against me as a *pro se* litigant, without them bothering to actually Review the Record. This process dragged until the first few months of 2018; along with a collateral illegal Eviction from our rented house, conducted by the Graham County Clerk of Court, colluding with the same District 30 Judge who had Allowed the illegal ICWA procedure to begin with.

Some of the second Western Federal District Court (Asheville) filing explanations can be found in the Attachment 'A' exhibits. In my opinion, there are enough glaring Fourteen Amendment to the U.S. Constitution and American with Disabilities (ADA) violations on the face of these allegations (charges) to warrant a *de novo* Review of the Whole Record, triggered by the very recent 22CVS23 Graham Co. N.C. District 30A filing; in which, once again, REFUSING to Allow an Attorney makes it nearly impossible to DEMAND a review of Record (with Subpoenas), given that *pro se* litigants are SUPPOSED to (by Law) receive some extra consideration; but we haven't at all, except for the brief Guardianship Hearing in 2014.

I respectfully ask this Court to Appoint a Competent Attorney to facilitate the Subpoena of Graham and Swain Co. N.C., Vaya Health MCO, and Abound Health (Charlotte) PERTINANT LEGAL RECORDS, along with the complete 12CVD78,

13CVD183, and subsequent State as well as all Federal Records, for the merits and demerits of what has occurred over the past ten years: the continual libelous and slanderous allegation, never Heard in any court, violating his Constitutional Due Process Rights, that he is a "Threat to Society".

I argue that this affects not only him; but all AUTISTIC, LEGALLY BLIND, CEREBRAL PALSY AFFECTED, AND MENTALLY CHALLENGED ADULTS in the State of North Carolina; and is of the utmost importance that this is now finally Heard in Federal Court, having exhausted all State and Federal remedies, twice, without a due process Hearing concerning the Whole Record; and his, and our, as his Caregiver State Guardians, SU8BSTANTIAL RIGHTS.

JURISDICTION

As we are Abound Health state employees, headquartered in Charlotte NC for over a year, and we have previously not been Allowed an Attorney in the Asheville Federal District Court (repeatedly), this is the proper Venue.

I contemplate this as a two-step process:

1) The *de novo* Review of the entire Legal Record. Our son's incompetency has not been challenged in now over eight years; thus there is no need for state and federal psychiatric "opinions" at this stage of the proceedings. A COMPLETE COMPREHENSIVE EVALUATION IS NECESSARY to determine his present "status", if that is necessary. I argue that the JI Riddle State Institution is the ONLY place where this can be done at present.

2) After the merits are established in this Whole Record Review, a Jury Trial for Relief for Substantial Damages is contemplated (in our case, it is "damages, or nothing"); where Graham and Swain Counties, NC (as "harboring" legal sub-entities of North Carolina, contracting with various Departments of the State) must be sued in a Civil Lawsuit; thus their Attorneys must be Subpoenaed to begin the required Mediation Process (if not beforehand; again, only an Attorney on our behalf can determine the proper Procedure, and what Legal Documents are necessary to proceed, so as to not overburden this Court, as Discovery could lead to thousands of pages of unnecessary supporting documents).

As my disabled son DJM's parent/advocate, legal guardian, and state of N.C. RAP employee, I hereby charge Graham County, North Carolina with the following glaring N.C. Statute Violations, in accordance with: [J]udgments shall not be reversed for "errors or defects which do not affect the substantial rights of the parties." 28 U. S. C. § 2111

## § 153A-4. Broad construction.

It is the policy of the General Assembly that the counties of this State should have adequate authority to exercise the powers, rights, duties, functions, privileges, and immunities conferred upon them by law. To this end, the provisions of this Chapter and of local acts shall be broadly construed and grants of power shall be construed to include any powers that are reasonably expedient to the exercise of the power. (1973, c. 822, s. 1.)

## § 153A-11. Corporate powers.

The inhabitants of each county are a body politic and corporate under the name specified in the act creating the county. Under that name they are vested with all the property and rights of property belonging to the corporation; have perpetual succession; may sue and be sued; may contract and be contracted with; may acquire

and hold any property and rights of property, real and personal, that may be devised, sold, or in any manner conveyed, dedicated to, or otherwise acquired by the corporation, and from time to time may hold, invest, sell, or dispose of the property and rights of property; may have a common seal and alter and renew it at will; and have and may exercise in conformity with the laws of this State county powers, rights, duties, functions, privileges, and immunities of every name and nature. (1868, c. 20, ss. 1, 2, 3, 8; 1876-7, c. 141, s. 1; Code, ss. 702, 703, 704, 707; Rev., ss. 1309, 1310, 1318; C.S., ss. 1290, 1291, 1297; 1973, c. 822, s. 1; 2011-284, s. 105.)

## § 153A-12. Exercise of corporate power.

Except as otherwise directed by law, each power, right, duty, function, privilege and immunity of the corporation shall be exercised by the board of commissioners. A power, right, duty, function, privilege, or immunity shall be carried into execution as provided by the laws of the State; a power, right, duty, function, privilege, or immunity that is conferred or imposed by law without direction or restriction as to how it is to be exercised or performed shall be carried into execution as provided by ordinance or resolution of the board of commissioners. (1868, c. 20, ss. 1, 2; 1876-7, c. 141, s. 1; Code, ss. 702, 703; Rev., s. 1309; C.S., s. 1290; 1973, c. 882, s. 1.)

## § 153A-13. Continuing contracts.

A county may enter into continuing contracts, some portion or all of which are to be performed in ensuing fiscal years. In order to enter into such a contract, the county must have sufficient funds appropriated to meet any amount to be paid under the contract in the fiscal year in which it is made. In each year, the board of commissioners shall appropriate sufficient funds to meet the amounts to be paid during the fiscal year under continuing contracts previously entered into. (1959, c. 250; 1973, c. 822, s. 1.)

## § 153A-76. Board of commissioners to organize county government.

The board of commissioners may create, change, abolish, and consolidate offices, positions, departments, boards, commissions, and agencies of the county government, may impose ex officio the duties of more than one office on a single officer, may change the composition and manner of selection of boards, commissions, and agencies, and may generally organize and reorganize the county government in order to promote orderly and efficient administration of county affairs, subject to the following limitations:

(6)     A board may not consolidate an area mental health, developmental disabilities, and substance abuse services board into a consolidated human services board. The board may not abolish an area mental health, developmental disabilities, and substance abuse services board, except as provided in Chapter 122C of the General Statutes. This subdivision shall not apply to any board that has exercised the powers and duties of an area mental health, developmental

disabilities, and substance abuse services board as of January 1, 2012.

## § 153A-77. Authority of boards of commissioners over commissions, boards, agencies, etc.

(a)      In the exercise of its jurisdiction over commissions, boards and agencies, the board of county commissioners may assume direct control of any activities theretofore conducted by or through any commission, board or agency by the adoption of a resolution assuming and conferring upon the board of county commissioners all powers, responsibilities and duties of any such commission, board or agency. This section shall apply to the board of health, the social services board, area mental health, developmental disabilities, and substance abuse area board or any other commission, board or agency appointed by the board of county commissioners or acting under and pursuant to authority of the board of county commissioners of said county except as provided in G.S. 153A-76. A board of county commissioners exercising the power and authority under this subsection may, notwithstanding G.S. 130A-25, enforce public health rules adopted by the board through the imposition of civil penalties. If a public health rule adopted by a board of county commissioners imposes a civil penalty, the provisions of G.S. 130A-25 making its violation a misdemeanor shall not be applicable to that public health rule unless the rule states that a violation of the rule is a misdemeanor. The board of county commissioners may exercise the power and authority herein conferred only after a public hearing held by said board pursuant to 30 days' notice of said public hearing given in a newspaper having general circulation in said county.

The board of county commissioners may also appoint advisory boards, committees, councils and agencies composed of qualified and interested county residents to study, interpret and develop community support and cooperation in activities conducted by or under the authority of the board of county commissioners of said county.

A board of county commissioners that has assumed direct control of a local health board after January 1, 2012, and that does not delegate the powers and duties of that board to a consolidated health service board shall appoint an advisory committee consistent with the membership described in G.S. 130A-35.

(b)      In the exercise of its jurisdiction over commissions, boards, and agencies, the board of county commissioners of a county having a county manager pursuant to G.S. 153A-81 may:

(3)      Create a consolidated county human services agency having the authority to carry out the functions of any combination of commissions, boards, or agencies appointed by the board of county commissioners or acting under and pursuant to authority of the board of county commissioners, including the local health department, the county department of social services, or the area mental health, developmental disabilities, and substance abuse services authority;

(c)    A consolidated human services board appointed by the board of county commissioners shall serve as the policy-making, rule-making, and administrative board of the consolidated human services agency. The consolidated human services board shall be composed of no more than 25 members. The composition of the board shall reasonably reflect the population makeup of the county and shall include: (all)

(d)    The consolidated human services board shall have authority to: (all, specifically:)

(12)    Perform comprehensive mental health services planning if the county is exercising the powers and duties of an area mental health, developmental disabilities, and substance abuse services board under the consolidated human services board.

Except as otherwise provided, the consolidated human services board shall have the powers and duties conferred by law upon a board of health, a social services board, and an area mental health, developmental disabilities, and substance abuse services board.

## § 153A-77.1. Single portal of entry.

A county may develop for human services a single portal of entry, a consolidated case management system, and a common data base; provided that if the county is part of a district health department or multicounty public health authority or a multicounty area mental health, developmental disabilities, and substance abuse authority, such action must be approved by the district board of health or public health authority board or the area mental health, developmental disabilities, and substance abuse board to affect any matter within the jurisdiction of that board. Nothing in this section shall be construed to abrogate a patient's right to confidentiality as provided by law. (1987, c. 422, s. 1; 1991 (Reg. Sess., 1992), c. 1030, s. 47; 1997-502, s. 5.)

## § 153A-255. Authority to provide social service programs.

Each county shall provide social service programs pursuant to Chapter 108A and Chapter 111 and may otherwise undertake, sponsor, organize, engage in, and support other social service programs intended to further the health, welfare, education, employment, safety, comfort, and convenience of its citizens. (1868, c. 20, s. 8; Code, s. 707; Rev., s. 1318; C.S., s. 1297; 1973, c. 822, s. 1; 1981, c. 562, s. 12; 1997-443, s. 12.13.)

## § 153A-257. Legal residence for social service purposes.

(a)    Legal residence in a county determines which county is responsible (i) for financial support of a needy person who meets the eligibility requirements for a public assistance or medical care program offered by the county or (ii) for other social services required by the person.

## § 153A-259. Counties authorized to contract with other entities for health and social services.

A county is authorized to contract with any governmental agency, person, association, or corporation for the provision of health or social services provided that the expenditure of funds pursuant to such contracts shall be for the purpose for which the funds were appropriated and is not otherwise prohibited by law. (1979, 2nd Sess., c. 1094, s. 2.)

## § 153A-435. Liability insurance; damage suits against a county involving governmental functions.

(a)     A county may contract to insure itself and any of its officers, agents, or employees against liability for wrongful death or negligent or intentional damage to person or property or against absolute liability for damage to person or property caused by an act or omission of the county or of any of its officers, agents, or employees when acting within the scope of their authority and the course of their employment. The board of commissioners shall determine what liabilities and what officers, agents, and employees shall be covered by any insurance purchased pursuant to this subsection.

Purchase of insurance pursuant to this subsection waives the county's governmental immunity, to the extent of insurance coverage, for any act or omission occurring in the exercise of a governmental function. Participation in a local government risk pool pursuant to Article 23 of General Statute Chapter 58 shall be deemed to be the purchase of insurance for the purposes of this section. By entering into an insurance contract with the county, an insurer waives any defense based upon the governmental immunity of the county.

If a county uses a funded reserve instead of purchasing insurance against liability for wrongful death, negligence, or intentional damage to personal property, or absolute liability for damage to person or property caused by an act or omission of the county or any of its officers, agents, or employees acting within the scope of their authority and the course of their employment, the county board of commissioners may adopt a resolution that deems the creation of a funded reserve to be the same as the purchase of insurance under this section. Adoption of such a resolution waives the county's governmental immunity only to the extent specified in the board's resolution, but in no event greater than funds available in the funded reserve for the payment of claims.

(b)     If a county has waived its governmental immunity pursuant to subsection (a) of this section, any person, or if he dies, his personal representative, sustaining damages as a result of an act or omission of the county or any of its officers, agents, or employees, occurring in the exercise of a governmental function, may sue the county for recovery of damages. To the extent of the coverage of insurance purchased pursuant to subsection (a) of this section, governmental immunity may not be a defense to the action. Otherwise, however, the county has all defenses available to private litigants in any action brought pursuant to this section without restriction, limitation, or other effect, whether the defense arises

from common law or by virtue of a statute.

Despite the purchase of insurance as authorized by subsection (a) of this section, the liability of a county for acts or omissions occurring in the exercise of governmental functions does not attach unless the plaintiff waives the right to have all issues of law or fact relating to insurance in the action determined by a jury. The judge shall hear and determine these issues without resort to a jury, and the jury shall be absent during any motion, argument, testimony, or announcement of findings of fact or conclusions of law relating to these issues unless the defendant requests a jury trial on them. (1955, c. 911, s. 1; 1973, c. 822, s. 1; 1985 (Reg. Sess., 1986), c. 1027, s. 27; 2003-175, s. 2.)

§ 153A-453. Quarterly reports by Mental Health, Developmental Disabilities, and Substance Abuse Services area authority or county program.

Quarterly reports by the area director and finance officer of Mental Health, Developmental Disabilities, and Substance Abuse Services area authorities or county programs shall be submitted to the county finance officer as provided under G.S. 122C-117(c). (2006-142, s. 3(b).

## ARGUMENTS OF THE CASE FROM FEDERAL CITATIONS

(Please forgive my lack of a Table of Contents, due to Time Constraints

in preparing and getting to Charlotte to file this Complaint.)

It remanded the case to the District Court with directions to appoint counsel for Robinson; to hold a hearing as to his sanity when he committed the alleged offense; and, if it found him to have been insane at that time, to order his release, subject to an examination into his present mental condition. The Court of Appeals directed that the District Court should also determine upon the hearing whether Robinson was denied due process by the state court's failure to conduct a hearing upon his competence to stand trial; and, if it were found his rights had been violated in this respect, that Robinson "should be ordered released, but such release may be delayed for a reasonable time . . . to permit the State of Illinois to grant Robinson a new trial." 345 F. 2d, at 698. We granted certiorari to resolve the difficult questions of state-federal relations posed by these rulings. 382 U. S. 890 (1965). We have concluded that Robinson was constitutionally entitled to a hearing on the issue of his competence to stand trial. *Pate v Robinson*, 383 US 375 (1966), at 377

The State concedes that the conviction of an accused person while he is legally incompetent violates due process, *Bishop* v. *United States*, 350 U. S. 961 (1956), and that state procedures must be adequate to protect this right. *Ibid, at* 378

it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his right to have the court determine his capacity to stand trial. See *Taylor* v. *United States*, 282 F. 2d 16, 23 (C. A. 8th Cir. 1960). *Ibid, at* 384

We believe that the evidence introduced on Robinson's behalf entitled him to a hearing on this

issue. The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial. See _Thomas_ v. _Cunningham_, 313 F. 2d 934 (C. A. 4th Cir. 1963). *Ibid,* at 385

Having determined that Robinson's constitutional rights were abridged by his failure to receive an adequate hearing on his competence to stand trial, we direct that the writ of habeas corpus must issue and Robinson be discharged, unless the State gives him a new trial within a reasonable time. This disposition accords with the procedure adopted in _Rogers_ v. _Richmond_, 365 U. S. 534 (1961). *Ibid,* at 386

This need for concurrent determination distinguishes the present case from _Jackson_ v. _Denno_, 378 U. S. 368 (1964), where we held that on remand the State could discharge its constitutional obligation by giving the accused a separate hearing. *Ibid,* at 387

In federal courts—and I assume no more is asked of state courts—the test of incompetence that warrants postponing the trial is reasonably well settled. In language this Court adopted on the one occasion it faced the issue, "the `test must be whether . . . [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " _Dusky_ v. _United States,_ 362 U. S. 402. *Ibid,* at 388

We granted certiorari in this case to consider petitioner's claims that he was deprived of due process of law by the failure of the trial court to order a psychiatric examination with respect to his competence to stand trial. _Drope v Missouri_, 420 US 162 (1975), at 164

Petitioner filed a motion for a new trial, the burden of which was that the trial court had erred in proceeding with the trial when no evidence had been produced that his absence from the trial was voluntary. A hearing was held before the judge who had presided at trial. *Ibid,* at 167

He alleged that… his constitutional rights had been violated by the failure to order a psychiatric examination prior to trial and by conducting the trial to conclusion in his absence. Petitioner also asserted that he had been denied the effective assistance of counsel, a claim which is not before us. At 169

Some have viewed the common-law prohibition "as a by-product of the ban against trials in *absentia;* the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself." Foote, A Comment on Pre-Trial Commitment of Criminal Defendants, 108 U. Pa. L. Rev. 832, 834 (1960). See _Thomas_ v. _Cunningham_, 313 F. 2d 934, 938 (CA4 1963). *Ibid,* at 171

[T]he dispute concerns the inferences that were to be drawn from the undisputed evidence and whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial. In such circumstances we believe it is "incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured." _Norris_ v. _Alabama_, 294 U. S. 587, 590 (1935). "When the corrective process is provided by the state but error, in relation to the federal question of constitutional violation, creeps into the record, we have the responsibility to review the state proceedings." _Hawk_ v. _Olson, supra,_ at 276. *Ibid,* at 175

[E]ven assuming the right to be present was one that could be waived, what we have already said makes it clear that there was an insufficient inquiry to afford a basis for deciding the issue

of waiver. Cf. *Westbrook v. Arizona, 384 U. S. 150 (1966)*; *United States v. Silva, 418 F. 2d 328 (CA2 1969)*. *Ibid, at* 182

It is uncontested that petitioner made a substantial showing of incompetency. It is also evident from the record, however, that the state court reached its competency determination without holding a hearing or providing petitioner with an adequate opportunity to provide his own expert evidence. Moreover, there is a strong argument that the court violated state law by failing to provide a competency hearing. If so, the violation undermines any reliance the State might now place on Justice Powell's assertion that "the States should have substantial leeway to determine what process best balances the various interests at stake." *Ibid.* Under AEDPA, a federal court may grant habeas relief, as relevant, only if a state court's "adjudication of [a claim on the merits] ... resulted in a decision that ... involved an unreasonable application" of the relevant federal law. § 2254(d)(1). *Panetti v Quarterman*, 127 S.Ct. 2842 (2007) 551 US 930, at 2846.

It is proper to allow the court charged with overseeing the development of the evidentiary record the initial opportunity to resolve petitioner's constitutional claim. *Ibid, at* 2847.

Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. *Brady v United States*, 397 US 742 (1970), at 748

The voluntariness of Brady's plea can be determined only by considering all of the relevant circumstances surrounding it. Cf. *Haynes v. Washington, 373 U. S. 503, 513 (1963)*; *Leyra v. Denno, 347 U. S. 556, 558 (1954)*. *Ibid, at* 749

[T]he agents of the State may not produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant. *Ibid, at* 750

On the basis of what he designated as "the undisputed evidence," the dissenting judge concluded that petitioner had pleaded guilty because of her reliance upon the legal advice of a Federal Bureau of Investigation (FBI) lawyer-agent, which advice "was, though honestly given, false." Neither the District Court nor the majority of the Circuit Court of Appeals controverted this conclusion of the dissenting judge. A challenge to a plea of guilty made by an indigent defendant, for whom no lawyer has been provided, on the ground that the plea was entered in reliance upon advice given by a government lawyer-agent, raises serious constitutional questions. Under these circumstances we granted certiorari in this case. 331 U.S. 800. *Von Moltke v Gillies*, 332 US 708 (1948), at 710

It seems pretty plain that the petitioner has raised the question here in the only proper way — by habeas corpus proceedings. *Ibid, at* 720

This Court has been particularly solicitous to see that this right was carefully preserved where the accused was ignorant and uneducated, was kept under close surveillance, and was the object of widespread public hostility. *Powell v. Alabama, 287 U.S. 45*. *Ibid, at* 720

Determining whether an accused is guilty or innocent of the charges in a complex legal indictment is seldom a simple and easy task for a layman, even though acutely intelligent. Conspiracy charges frequently are of broad and confusing scope, and that is particularly true of conspiracies under the Espionage Act. See, *e.g., Gorin v. United States, 312 U.S. 19*; *United States v. Heine, 151 F.2d 813*. And especially misleading to a layman are the overt act

allegations of a conspiracy. Such charges are often, as in this indictment mere statements of past associations or conferences with other persons, which activities apparently are entirely harmless standing alone. A layman reading the overt act charges of this indictment might reasonably think that one could be convicted under the indictment simply because he had, in perfect innocence, associated with some criminal at the time and place alleged. The undisputed evidence in this case that petitioner was concerned about many of these legal questions — such as the significance of the overt act charges, and her possibilities of defense should all her co-defendants plead guilty — emphasizes her need for the aid of counsel at this stage. *Ibid,* at 721, 722.

It is the solemn duty of a federal judge before whom a defendant appears without counsel to make a thorough inquiry and to take all steps necessary to insure the fullest protection of this constitutional right at every stage of the proceedings. <u>Johnson</u> v. <u>Zerbst, 304 U.S. 458, 463</u>; <u>Hawk</u> v. <u>Olson, 326 U.S. 271, 278</u>. This duty cannot be discharged as though it were a mere procedural formality. *Ibid,* at 722

We are unable to agree with the government's argument that the momentary appointment of the lawyer for arraignment purposes supports the contention that the petitioner intelligently waived her right to counsel. In fact, that court episode points in the other direction. for the judge then told the petitioner that he would appoint another lawyer "right away" for her — which he never did until long after she had pleaded guilty, too late to do her any good.

*Fourth.* We have said: "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused — whose life or liberty is at stake — is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. *Ibid,* at 723, 724

[T]his case shows that such routine inquiries may be inadequate although the Constitution "does not require that under all circumstances counsel be forced upon a defendant." <u>Carter</u> v. <u>Illinois, 329 U.S. 173, 174-175</u>. For the record demonstrates that the petitioner welcomed legal aid from all possible sources; there would have been no necessity for forcing counsel on her. *Ibid,* at 724

*Fifth.* The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client. <u>Glasser</u> v. <u>United States, 315 U.S. 60, 70</u>. *Ibid,* at 725

The admitted circumstances here cannot support a holding that petitioner intelligently and understandingly waived her right to counsel. She was entitled to counsel other than that given her by Government agents. She is still entitled to that counsel before her life or her liberty can be taken from her. *Ibid,* at 726

[T]he error from which these petitioners suffered was a **denial of rights guaranteed against invasion by the Fifth and Fourteenth Amendments,** [my emphasis] rights rooted in the Bill of Rights, offered and championed in the Congress by James Madison, who told the Congress that

the "independent" federal courts would be the "guardians of those rights." *Chapman v California*, 386 US 18 (1967), at 21

With faithfulness to the constitutional union of the States, **we cannot leave to the States the formulation of the authoritative laws, rules, and remedies** [my emphasis] designed to protect people from infractions by the States of federally guaranteed rights. *Ibid*, at 21

The simple legal question before the Court calls for a construction of the language of 28 U. S. C. § 2254 (a), which provides that **the federal courts shall entertain an application for a writ of habeas corpus** [my emphasis] "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Wainwright v Sykes*, 433 US 72 (1977), at 77

> (1) What types of federal claims may a federal habeas court properly consider? (2) Where a federal claim is cognizable by a federal habeas court, to what extent must that court defer to a resolution of the claim in prior state proceedings? (3) To what extent must the petitioner who seeks federal habeas exhaust state remedies before resorting to the federal court? (4) In what instances will an adequate and independent state ground bar consideration of otherwise cognizable federal issues on federal habeas review? *Ibid*, at 78, 79

In *Johnson* v. *Zerbst*, 304 U. S. 458, 463 (1938), an indigent federal prisoner's claim that he was **denied the right to counsel at his trial** [my emphasis] was held to state a contention going to the "power and authority" of the trial court, which might be reviewed on habeas. Finally, in *Waley* v. *Johnston*, 316 U. S. 101 (1942), the Court openly discarded the concept of jurisdiction—by then more a fiction than anything else—as a touchstone of the availability of federal habeas review, and acknowledged that such review is available for claims of "disregard of the constitutional rights of the accused, and where **the writ is the only effective means of preserving his rights**." [my emphasis] *Id.*, at 104-105. *Ibid*, at 79

"[Such] state adjudication carries the weight that federal practice gives to the conclusion of a **court of last resort of another jurisdiction on federal constitutional issues.** [my emphasis] It is not *res judicata.*" 344 U. S., at 458. The duty of the federal habeas court to hold a factfinding hearing in specific situations, notwithstanding the prior resolution of the issues in state court, was thoroughly explored in this Court's later decision in *Townsend* v. *Sain*, 372 U. S. 293 (1963). *Ibid*, at 80

The area of controversy which has developed has concerned the reviewability of federal claims which the state court has declined to pass on because not presented in the manner prescribed by its *procedural* rules. The adequacy of such an independent state procedural ground to prevent federal habeas review of the underlying federal issue has been treated very differently than where the state-law ground is substantive. The pertinent decisions marking the Court's somewhat tortuous efforts to deal with this problem are: *Ex parte Spencer*, 228 U. S. 652 (1913); *Brown* v. *Allen*, 344 U. S. 443 (1953); *Fay* v. *Noia, supra*; *Davis* v. *United States*, 411 U. S. 233 (1973); and *Francis* v. *Henderson*, 425 U. S. 536 (1976). *Ibid*, at 82

"[T]he doctrine under which state procedural defaults are held to constitute an adequate and independent state law ground barring direct Supreme Court review is not to be extended to limit the power granted the federal courts under the federal habeas statute." 372 U. S., at 399.  *Ibid,* at 83

When **the process of direct review — which, if a federal question is involved, includes the right to petition this Court** [my emphasis] for a writ of certiorari — comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  *Barefoot v Estelle,* 463 US 880 (1983), at 887

[F]ederal courts must isolate the exceptional cases where constitutional error requires retrial or resentencing as certainly and swiftly as orderly procedures will permit. They need not, and should not, however, fail to **give nonfrivolous claims of constitutional error the careful attention that they deserve.** [my emphasis] *Ibid,* at 888

We have previously held that "if an appellant persuades an appropriate tribunal that **probable cause for an appeal exists, he must then be afforded an opportunity to address the underlying merits.**" [my emphasis] *Garrison* v. *Patterson, supra, at 466 (per curium).* See *Nowakowski* v. *Maroney, supra; Carafas* v. *LaVallee, supra.  Ibid,* at 889

"This Court has had **the benefit of the full trial court record** [my emphasis] except for a few exhibits unimportant to our considerations. We have read the arguments and materials filed by the parties. The petitioner is represented here, as he has been throughout the habeas corpus proceedings in state and federal courts, **by a competent attorney experienced in this area of the law.** [my emphasis]  We have heard full arguments in open court.  *Ibid,* at 891

Acceptance of petitioner's position that expert testimony about future dangerousness is far too unreliable to be admissible would immediately call into question those other contexts in which predictions of future behavior are constantly made. For example, in *O'Connor* v. *Donaldson, 422 U. S. 563, 576 (1975),* we held that a nondangerous mental hospital patient could not be held in confinement against his will. Later, speaking about the requirements for civil commitments, we said:

"There may be factual issues in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington* v. *Texas, 441 U. S. 418, 429 (1979).*

In the second place, the rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party. Psychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case but also as generally so unreliable that it should be ignored. If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors. *Ibid,* at 898, 899

In *Garrison,* in contrast to this case, the Court of Appeals *did* decide the prisoner's appeal. It issued an order in which it granted a certificate of probable cause and in the next sentence affirmed the District Court's decision without explanation. *Id.,* at 465. To determine whether this was merely a *pro forma* decision unaccompanied by any real consideration of the issues, we solicited further submissions from the parties "to determine whether the merits had been addressed. . . at the unrecorded hearing" before the Court of Appeals. *Id.,* at 466, n. 2. Since the responses we received did not demonstrate that the Court of Appeals had actually considered the merits, *ibid.,* we reversed and remanded for further consideration of the appeal.

*Garrison* establishes that <u>consideration of the merits is *necessary* to satisfy a court of appeals' statutory obligation.</u> [my emphasis] *Ibid,* at 911

Providing equal justice for poor and rich, weak and powerful alike is an age-old problem. People have never ceased to hope and strive to move closer to that goal. *Griffin v Illinois*, 351 US 12 (1956), at 16

Both equal protection and due process emphasize the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, "stand on an equality before the bar of justice in every American court." *Chambers* v. *Florida,* 309 U. S. 227, 241. See also *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369.

Surely no one would contend that either a State or the Federal Government could constitutionally provide that defendants unable to pay court costs in advance should be denied the right to plead not guilty or to defend themselves in court. Such a law would make the constitutional promise of a fair trial a worthless thing. Notice, the right to be heard, and the right to counsel would under such circumstances be meaningless promises to the poor. In criminal trials a State can no more discriminate on account of poverty than on account of religion, race, or color. Plainly <u>the ability to pay costs in advance bears no rational relationship to a defendant's guilt or innocence</u> [my emphasis] and could not be used as an excuse to deprive a defendant of a fair trial.

There is no meaningful distinction between a rule which would deny the poor the right to defend themselves in a trial court and one which effectively denies the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance. It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all. See, *e. g., McKane* v. *Durston,* 153 U. S. 684, 687-688. But that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty. Appellate review has now become an integral part of the Illinois trial system for finally adjudicating the guilt or innocence of a defendant. Consequently <u>at all stages of the proceedings the Due Process and Equal Protection Clauses protect persons like petitioners from invidious discriminations.</u> [my emphasis] See *Cole* v. *Arkansas,* 333 U. S. 196, 201; *Dowd* v. *United States ex rel. Cook,* 340 U. S. 206, 208; *Cochran* v. *Kansas,* 316 U. S. 255, 257; *Frank* v. *Mangum,* 237 U. S. 309, 327. *Ibid,* at 17, 18

[T]he Court was careful to point out that habeas corpus is not an appropriate or available remedy for damages claims, which, if not frivolous and of sufficient substance to invoke the jurisdiction of the federal court, <u>could be pressed under § 1983 along with suits</u> [my emphasis] challenging the conditions of confinement rather than the fact or length of custody. 411 U. S., at 494, 498-499. *Wolff v McDonnell,* 418 US 539 (1974), at 554

[T]he prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those **minimum procedures appropriate under the circumstances and required by the Due Process Clause** [my emphasis] to insure that the state-created right is not arbitrarily abrogated. *Ibid,* at 557

In *Preiser* v. *Rodriguez, supra,* the prisoner complained that he had been deprived of good-time credits **without notice or hearing and without due process of law.** [my emphasis] We considered the claim a proper subject for a federal habeas corpus proceeding.

This analysis as to liberty parallels the accepted due process analysis as to property. The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests. *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring). The requirement for some kind of a hearing applies to the taking of private property, *Grannis* v. *Ordean,* 234 U. S. 385 (1914), the revocation of licenses, *In re Ruffalo,* 390 U. S. 544 (1968), the operation of state dispute-settlement mechanisms, when one person seeks to take property from another, or to government-created jobs held, absent "cause" for termination, *Board of Regents* v. *Roth,* 408 U. S. 564 (1972); *Arnett* v. *Kennedy,* 416 U. S. 134, 164 (1974) (POWELL, J., concurring); *id.,* at 171 (WHITE, J., concurring in part and dissenting in part); *id.,* at 206 (MARSHALL, J., dissenting). Cf. *Stanley* v. *Illinois,* 405 U. S. 645, 652-654 (1972); *Bell* v. *Burson,* 402 U. S. 535 (1971).

We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. *Ibid,* at 557, 558

We have often repeated that "[t]he very nature of **due process negates any concept of inflexible procedures universally applicable** [my emphasis] to every imaginable situation." *Cafeteria Workers* v. *McElroy,* 367 U. S., at 895. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Ibid.; Morrissey,* 408 U. S., at 481. *Ibid,* at 560

Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact. See *In re Gault,* 387 U. S. 1, 33-34, and n. 54 (1967). *Ibid,* at 564

The last issue presented is whether the Complex must make available, and if so has made available, adequate legal assistance, under *Johnson* v. *Avery, supra,* for the preparation of habeas corpus petitions and civil rights actions by inmates. *Ibid,* at 577

**[T]he demarcation line between civil rights actions and habeas petitions is not always clear.** [my emphasis]  The Court has already recognized instances where the same constitutional rights might be redressed under either form of relief. Cf. *Preiser* v. *Rodriguez,* 411 U. S. 475 (1973); *Haines* v. *Kerner,* 404 U. S. 519 (1972); *Wilwording* v. *Swenson,* 404 U. S. 249 (1971). Second, while it is true that only in habeas actions may relief be granted which will shorten the term of confinement, *Preiser, supra,* it is more pertinent that both actions serve to protect basic constitutional rights. The right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than does the Great Writ. The recognition by this Court that prisoners

have certain constitutional rights which can be protected by civil rights actions would be diluted if inmates, often "totally or functionally illiterate," were unable to articulate their complaints to the courts. Although there may be additional burdens on the Complex, if inmates may seek help from other inmates, or from the inmate adviser if he proves adequate, in both habeas and civil rights actions, this should not prove overwhelming. *Ibid,* at 579

Finding no reasonable distinction between the two forms of actions, we affirm the Court of Appeals on this point, and as the Court of Appeals suggested, the District Court will assess the adequacy of legal assistance under the reasonable-alternative standard of *Avery. Ibid,* at 580

[T]he purpose of notice is to give the accused the opportunity to prepare a defense, and the purpose of a hearing is to afford him the chance to present that defense. Today's decision deprives an accused inmate of any enforceable constitutional right to the procedural tools essential to the presentation of any meaningful defense, and makes the required notice and hearing formalities of little utility. Without the enforceable right to call witnesses and present documentary evidence, an accused inmate is not guaranteed the right to present any defense beyond his own word. Without any right to confront and cross-examine adverse witnesses, the inmate is afforded no means to challenge the word of his accusers. Without these procedures, a disciplinary board cannot resolve disputed factual issues in any rational or accurate way. The hearing will thus amount to little more than a swearing contest, with each side telling its version of the facts—and, indeed, with only the prisoner's story subject to being tested by cross-examination. In such a contest, it seems obvious to me that even the wrongfully charged inmate will invariably be the loser. I see no justification for the Court's refusal to extend to prisoners these procedural safeguards which in every other context we have found to be among the "*minimum* requirements of due process." *Morrissey* v. *Brewer,* 408 U. S. 471, 489 (1972) (emphasis added). *Ibid,* at 581, 582

I would make clear that an accused inmate's right to present witnesses and submit other evidence in his defense is constitutionally protected and, if unnecessarily abridged, judicially enforceable. As we said only last Term: **"Few rights are more fundamental than that of an accused to present witnesses in his own defense."** [my emphasis] *Chambers* v. *Mississippi,* 410 U. S. 284, 302 (1973).

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the [hearing body] so it may decide where the truth lies." *Washington* v. *Texas,* 388 U. S. 14, 19 (1967).

See also *Morrissey* v. *Brewer, supra,* at 489; *In re Oliver,* 333 U. S. 257, 273 (1948). The right to present the testimony of impartial witnesses and real evidence to corroborate his version of the facts is particularly crucial to an accused inmate, who obviously faces a severe credibility problem when trying to disprove the charges of a prison guard. See *Clutchette* v. *Procunier,* 497 F. 2d 809, 818 (CA9 1974); ABA Commission on Correctional Facilities and Services, Survey of Prison Disciplinary Practices and Procedures 19 (1974) (hereinafter ABA Survey). *Ibid,* at 583

[I]n *Greene* v. *McElroy,* 360 U. S. 474, 496 (1959), we found that the view that cross-

examination and confrontation must be permitted whenever "governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings" was one of the "immutable" principles of our jurisprudence—immutable, that is, until today. See

also *Arnett* v. *Kennedy, supra, at 215* (MARSHALL, J., dissenting); *Chambers* v. *Mississippi, supra, at 294-295*; *Morrissey* v. *Brewer*, 408 U. S., at 489; *In re Gault*, 387 U. S. 1, 56-57 (1967). *Ibid,* at 586

[T]he Court refuses to enforce prisoners' fundamental procedural rights because of a **legitimate concern for secrecy** [my emphasis] which must affect only a tiny fraction of disciplinary cases. This is surely permitting the tail to wag the constitutional dog. When faced with a similar problem in *Morrissey* v. *Brewer, supra,* we nonetheless held that the parolee had the constitutional right to confront and cross-examine adverse witnesses, and permitted an exception to be made "if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed." 408 U. S., at 487. In my view, the same approach would be appropriate here. *Ibid,* a *at* 587

The Court next turns to the question of an accused inmate's right to counsel, and quotes a long passage from our decision last Term in *Gagnon* v. *Scarpelli*, 411 U. S. 778 (1973), in support of its conclusion that appointed counsel need not be provided and retained counsel need not be permitted in prison disciplinary proceedings at this time. The Court seemingly forgets that the holding of *Scarpelli* was that **fundamental fairness requires the appointment of counsel** [my emphasis] in some probation revocation or parole revocation proceedings and overlooks its conclusion that

"the effectiveness of the rights guaranteed by *Morrissey* may in some circumstances depend on the use of skills which the probationer or parolee is unlikely to possess. Despite the informal nature of the proceedings and the absence of technical rules of procedure or evidence, the unskilled or uneducated probationer or parolee may well have difficulty in **presenting his version of a disputed set of facts** [my emphasis] where the presentation requires the examining or cross-examining of witnesses or **the offering or dissecting of complex documentary evidence."** [my emphasis] *Id.,* at 786-787. *Ibid,* at 590, 591

Due process rights are required whenever an individual risks condemnation to a " `grievous loss,' " *Morrissey* v. *Brewer*, 408 U. S. 471, 481; *Goldberg* v. *Kelly*, 397 U. S. 254, 263; *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 168 (Frankfurter, J., concurring). Thus due process is required before the termination of welfare benefits, *Goldberg, supra;* revocation of parole or probation, *Morrissey, supra,* and *Gagnon* v. *Scarpelli*, 411 U. S. 778; revocation of a driver's license, *Bell* v. *Burson*, 402 U. S. 535; and attachment of wages, *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337. *Ibid,* at 594

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. . . . This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases . . . but also **in all types of cases where administrative and regulatory actions were under scrutiny."** [my emphasis] *Greene* v. *McElroy*, 360 U. S. 474, 496-497.

*Ibid,* at 595, 596

"Not only the principle of judicial review, but the whole scheme of American government, reflects an institutionalized mistrust of any such unchecked and unbalanced power over essential liberties. That mistrust does not depend on an assumption of inveterate venality or incompetence on the part of men in power . . . ." *Covington* v. *Harris,* 136 U. S. App. D. C. 35, 39, 419 F. 2d 617, 621. *Ibid,* at 596

As the Court itself agrees in holding that **the disciplinary board must provide a statement of reasons for its ultimate determination on the merits,** [my emphasis] *ante,* at 564-565, such a written statement is crucial not only to provide a basis for review, but to ensure that the board "will act fairly." *Ante,* at 565. *Ibid, at* 598

We are asked in this case to decide whether *Douglas* v. *California,* 372 U. S. 353 (1963), which **requires appointment of counsel for indigent state defendants on their first appeal as of right,** [my emphasis] should be extended to require counsel for discretionary state appeals and for applications for review in this Court. The Court of Appeals for the Fourth Circuit held that such appointment was required by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Ross v Moffitt*, 417 US 600 (1974), at 603

The decisions discussed above stand for the proposition that a State cannot arbitrarily cut off appeal rights for indigents while leaving open avenues of appeal for more affluent persons. In *Douglas* v. *California,* 372 U. S. 353 (1963), however, a case decided the same day as *Lane, supra,* and *Draper, supra,* the Court departed somewhat from the limited doctrine of the transcript and fee cases and undertook an examination of whether an indigent's access to the appellate system was adequate. The Court in *Douglas* concluded that a State does not fulfill its responsibility toward indigent defendants merely by waiving its own requirements that a convicted defendant procure a transcript or pay a fee in order to appeal, and held that the State must go further and **provide counsel for the indigent on his first appeal as of right.** [my emphasis] *Ibid, at* 607

This Court held unconstitutional California's requirement that counsel on appeal would be appointed for an indigent only if the appellate court determined that such appointment would be helpful to the defendant or to the court itself. The Court noted that under this system an indigent's case was initially reviewed on the merits without the benefit of any organization or argument by counsel. By contrast, persons of greater means were not faced with the preliminary "*ex parte* examination of the record," *id.,* at 356, but had their arguments presented to the court in fully briefed form. *Ibid,* at 608

it is appropriate to observe that a State can, consistently with the Fourteenth Amendment, provide for differences **so long as the result does not amount to a denial of due process or an `invidious discrimination.'** [my emphasis] *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489; *Griffin* v. *Illinois, supra,* p. 18. *Ibid,* at 608

"Due process" emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. "Equal protection," on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable. *Ibid,* at 609

The Court in *Douglas* stated that "[w]hen an indigent is forced to run this gantlet of a preliminary showing of merit, the right to appeal does not comport with fair procedure." 372 U. S., at 357. Mr. Justice Harlan thought that the due process issue in *Douglas* was the only one worthy of extended consideration, remarking: "The real question in this case, I submit, and the only one that permits of satisfactory analysis, is whether or not the state rule, as applied in this case, is

**consistent with the requirements of fair procedure guaranteed by the Due Process Clause.**" [my emphasis] *Id.,* at 363. *Ibid,* at 609, 610

At the trial stage of a criminal proceeding, the right of an indigent defendant to counsel is fundamental and binding upon the States by virtue of the Sixth and Fourteenth Amendments. *Gideon* v. *Wainwright,* 372 U. S. 335 (1963). But there are significant differences between the trial and appellate stages of a criminal proceeding. The purpose of the trial stage from the State's point of view is to convert a criminal defendant from a person presumed innocent to one found guilty beyond a reasonable doubt. To accomplish this purpose, the State employs a prosecuting attorney who presents evidence to the court, challenges any witnesses offered by the defendant, argues rulings of the court, and makes direct arguments to the court and jury seeking to persuade them of the defendant's guilt. Under these circumstances "reason and reflection require us to recognize that in our adversary system of criminal justice, **any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him.**" [my emphasis] *Id.,* at 344. *Ibid,* at 610

Language invoking equal protection notions is prominent both in *Douglas* and in other cases treating the rights of indigents on appeal. The Court in *Douglas,* for example, stated:

"[W]here the merits of *the one and only appeal* an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor." 372 U. S., at 357. (Emphasis in original.)

The Court in *Burns* v. *Ohio,* stated the issue in the following terms:

"[O]nce the State chooses to establish appellate review in criminal cases, it may not foreclose indigents from access to any phase of that procedure because of their poverty." 360 U. S., at 257 *Ibid,* at 611

A second appeal of right lies to the Supreme Court in any criminal case "(1) [w]hich directly involves a substantial question arising under the Constitution of the United States or of this State, or (2) [i]n which there is a dissent. . . ." N. C. Gen. Stat. § 7A-30 (1969). All other decisions of the Court of Appeals on direct review of criminal cases may be further reviewed in the Supreme Court on a discretionary basis.

The statute governing discretionary appeals to the Supreme Court is N. C. Gen. Stat. § 7A-31 (1969). *Ibid,* at 613

"In causes subject to certification under subsection (a) of this section, certification may be made by the Supreme Court after determination of the cause by the Court of Appeals when in the opinion of the Supreme Court (1) The subject matter of the appeal has significant public interest, or (2) The cause involves legal principles of major significance to the jurisprudence of the State, or (3) The decision of the Court of Appeals appears likely to be in conflict with a decision of the Supreme Court."

Appointment of counsel for indigents in North Carolina is governed by N. C. Gen. Stat. § 7A-450 *et seq.* (1969 and Supp. 1973). *Ibid,* at 614

This is not to say, of course, that a skilled lawyer, particularly one trained in the somewhat arcane art of preparing petitions for discretionary review, would not prove helpful to any litigant

able to employ him. An indigent defendant seeking review in the Supreme Court of North Carolina is therefore somewhat handicapped in comparison with a wealthy defendant who has counsel assisting him in every conceivable manner at every stage in the proceeding. But both the opportunity to have counsel prepare an initial brief in the Court of Appeals and the nature of discretionary review in the Supreme Court of North Carolina make this relative handicap far less than **the handicap borne by the indigent defendant denied counsel on his initial appeal as of right** [my emphasis] in *Douglas. Ibid,* at 616

The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to **assure the indigent defendant an adequate opportunity to present his claims fairly** [my emphasis] in the context of the State's appellate process. *Ibid,* at 616

The right to seek certiorari in this Court is not granted by any State, and exists by virtue of federal statute with or without the consent of the State whose judgment is sought to be reviewed. *Ibid,* at 617

In *Douglas* v. *California,* 372 U. S. 353, we considered the necessity for appointed counsel on the first appeal as of right, the only issue before us. We did not deal with the appointment of counsel for later levels of discretionary review, either to the higher state courts or to this Court, but we noted that "there can be no equal justice where the kind of an appeal a man enjoys `depends on the amount of money he has.' " *Id.,* at 355.

Chief Judge Haynsworth could find "no logical basis for differentiation between appeals of right and permissive review procedures in the context of the Constitution and the right to counsel." 483 F. 2d, at 653. *Ibid,* at 619

Chief Judge Haynsworth also correctly observed that the indigent defendant proceeding without counsel is at a substantial disadvantage relative to wealthy defendants represented by counsel when he is forced to fend for himself in seeking discretionary review from the State Supreme Court or from this Court. It may well not be enough to allege error in the courts below in layman's terms; a more sophisticated approach may be demanded:

"An indigent defendant is as much in need of the assistance of a lawyer in preparing and filing a petition for certiorari as he is in the handling of an appeal as of right. In many appeals, an articulate defendant could file an effective brief by telling his story in simple language without legalisms, but the technical requirements for applications for writs of certiorari are hazards which one untrained in the law could hardly be expected to negotiate.

" `Certiorari proceedings constitute a highly specialized aspect of appellate work. The factors which [a court] deems important in connection with deciding whether to grant certiorari are certainly not within the normal knowledge of an indigent appellant. Boskey, The Right to Counsel in Appellate Proceedings, 45 Minn. L. Rev. 783, 797 (1961) (footnote omitted).' " 483 F. 2d, at 653. *Ibid,* at 620, 621

*Douglas* v. *California* was grounded on concepts of fairness and equality. The right to seek discretionary review is a substantial one, and one where a lawyer can be of significant assistance to an indigent defendant. It was correctly perceived below that the "same concepts of fairness and equality, which require counsel in a first appeal of right, require counsel in other and subsequent discretionary appeals." *Id.,* at 655. *Ibid,* at 621

Footnote [5] *Id.,* at 655. The court then decided to remand the case to the District Court to "appraise the substantiality of the federal claim." The court noted that it had no opportunity to examine the papers filed in the State Supreme Court and said that "[i]n the circumstances of this case . . . , where the only remedy available to the District Court would be the prisoner's release on a writ of habeas corpus," it was appropriate for the District Court to determine whether respondent's claim was "patently frivolous." *Ibid.*

Footnote [8] The Court of Appeals in this case, for example, examined both possible rationales, stating:

"If the holding [in *Douglas*] be grounded on the equal protection clause, inequality in the circumstances of these cases is as obvious as it was in the circumstances of *Douglas*. If the holding in *Douglas* were grounded on the due process clause, and Mr. Justice Harlan in dissent thought the discourse should have been in those terms, due process encompasses elements of equality. There simply cannot be due process of the law to a litigant deprived of all professional assistance when other litigants, similarly situated, are able to obtain professional assistance and to be benefited by it. The same concepts of fairness and equality, which require counsel in a first appeal of right, require counsel in other and subsequent discretionary appeals." 483 F. 2d, at 655.

Footnote [11] For example, subsection (b) (6) of § 7A-451, effective at the time of respondent's appeals, provides for counsel on "[d]irect review of any judgment or decree, including review by the United States Supreme Court of final judgment or decrees rendered by the highest court of North Carolina in which decision may be had." But this provision apparently has not b+ --+een construed to allow counsel for permissive appellate procedures. See 483 F. 2d, at 652.

[12] Section 7A-451 of N. C. Gen. Stat. (Supp. 1973) provides: [all highlighted sections my emphasis]

**"(a) An indigent person is entitled to services of counsel in the following actions and proceedings:**

"(1) Any case in which **imprisonment, or a fine** of five hundred dollars ($500.00), or more, is likely to be adjudged;

"(2) **A hearing on a petition for a writ of habeas corpus** under Chapter 17 of the General Statutes;  .....

"(5) **A hearing in which extradition to another state is sought**;

"(6) A proceeding for judicial hospitalization under Chapter 122, Article 7 (Judicial Hospitalization) or Article 11 (Mentally Ill Criminals), of the General Statutes and **a proceeding for involuntary commitment to a treatment facility** under Article 5 of Chapter 122 of the General Statutes;  .....

"(8) In the case of a juvenile [*incompetent,* **a hearing as a result of which commitment to an institution or transfer to the superior court for trial** on a felony charge is possible."

I, RONALD D. METCALF,

In behalf of my incompetent, disabled son,

Of whom I am a parent/advocate, legal guardian

(but not over his "estate"), and state actor caregiver employee,

Do hereby swear that the statements made in the foregoing

PETITION FOR REVIEW OF WHOLE RECORD

Are True, to my best ability to ascertain the complex issues

In these various Filings and petitions.

Date: 3/28/2022

Ronald D. Metcalf, *pro se*

169 Atoah Street, Robbinsville , North Carolina 28771

cherubcalf 747 @gmail.com

407-401-2445 (cell phone only; we have lived in N.C. for 13 ½ years).